1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    MICHAEL TENORE,                          No.  2:11-cv-1082 WBS CKD P

12              Plaintiff,

13         v.                                  FINDINGS AND RECOMMENDATIONS

14    NATHANAEL GOODGAME, et al.,

15              Defendants.

16

17    I. Introduction

18         Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief

19    under 42 U.S.C. § 1983.  This action proceeds on the amended complaint filed August 29, 2012,

20    which alleges that defendants were deliberately indifferent in the diagnosis and treatment of

21    plaintiff's scabies infection while he was housed at Mule Creek State Prison ("MCSP").  (ECF

22    No. 22 ("FAC").)  Pending before the court is defendants' August 9, 2013 motion for summary

23    judgment (ECF No. 44), which has been briefed by the parties.  (ECF Nos. 53, 58.)  For the

24    reasons discussed below, the undersigned will recommend that defendants' motion be granted in

25    part and denied in part.

26    II. Summary Judgment Standards Under Rule 56

27         Summary judgment is appropriate when it is demonstrated that there "is no genuine

28    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

1

1    Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

2    "citing to particular parts of materials in the record, including depositions, documents,

3    electronically stored information, affidavits or declarations, stipulations (including those made for

4    purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

5    Civ. P. 56(c)(1)(A).

6         Summary judgment should be entered, after adequate time for discovery and upon motion,

7    against a party who fails to make a showing sufficient to establish the existence of an element

8    essential to that party's case, and on which that party will bear the burden of proof at trial.  See

9    Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

10   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

11   Id.

12        If the moving party meets its initial responsibility, the burden then shifts to the opposing

13   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

14   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

15   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

16   of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

17   and/or admissible discovery material, in support of its contention that the dispute exists or show

18   that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

19   R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

20   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

21   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

22   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

23   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

24   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

25        In the endeavor to establish the existence of a factual dispute, the opposing party need not

26   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

27   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

28   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

2

1  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

2  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

3  amendments).

4      In resolving the summary judgment motion, the evidence of the opposing party is to be

5  believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

6  facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

7  U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

8  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

9  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

10  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

11  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

12  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

14  III.  Discussion

15  A.  Facts

16      Plaintiff alleges in a verified complaint[1] that, in the first week of September 2009, he

17  began experiencing severe itching in the area of his lower body and genitals.  (FAC ¶ 20.)  He

18  sought treatment from medical staff, who prescribed ineffective treatments over the course of

19  several months, during which plaintiff's condition worsened into "intense, severe, full-body

20  itching" that resulted in bleeding, bruising, and "horrendous" discomfort.  (Id., ¶ 28.)  Finally, in

21  March 2010, after plaintiff's cellmate began showing identical symptoms, plaintiff was diagnosed

22  with scabies[2] and began an effective course of treatment.  (Id., ¶¶ 48, 52.)  By April 2010,

23  plaintiff had "prominent scars . . . on his legs, arms, and around his body from 'uncontrollable'

24  scratching – while awake and in his sleep; that is when he was able to sleep at all."  (Id., ¶ 28.)

25

26  [1] A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence. Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000).

27

28  [2] Scabies is an itchy skin condition caused by the microscopic mite Sarcoptes scabei.  See Centers for Disease Control and Prevention, http://www.cdc.gov/parasites/scabies/gen_info/faqs.html.

3

1   He describes his seven-month condition as "[t]orture with no relief, and no help."  (Id.)

2   1. Plaintiff's Symptoms and Treatment

3          The following facts are undisputed except where otherwise indicated[3]:

4          At all relevant times, plaintiff was a state prisoner housed at MCSP.  Prison physician

5   Tseng, Registered Nurse Goodgame, Chief Physician and Surgeon Smith, Chief Medical Officer

6   Heatley, and Chief Executive Officer Heffner, worked at MCSP during this period.

7          During the first week of September 2009, plaintiff began experiencing itching in the area

8   of his lower body and genitals.  (FAC ¶ 20.)  On September 8, plaintiff was examined by Dr.

9   Tseng for a follow-up regarding an examination for a pre-cancerous condition.[4]  (DUF 2.)  After

10  discussing this issue, plaintiff "attempted to get [Dr.] Tseng to address the severe itching Plaintiff

11  suffered (scabies)."  Dr. Tseng told plaintiff they were "out of time" and "would talk about that

12  next time"; he advised plaintiff to "put in a sick-call form."  (FAC ¶ 23.)

13         The next day, plaintiff submitted a medical request form complaining of a rash and

14  accompanying itching.  (DUF 3.)  He stated in part: "This itching is driving me nuts; please

15  provide something ASAP – Thank you."  (ECF No. 44-5 at 13.)

16         The following day, September 10, Nurse Goodgame examined plaintiff.[5]  Plaintiff

17  complained of an itchy rash on his groin area that started ten days prior and had spread to his

18  thigh and the sides of his upper torso.  At the time of the examination, plaintiff had a red rash on

19  the skin folds of his chest, the sides of his torso, and on his groin.  Goodgame provided plaintiff

20  with an anti-fungal cream and advised him to return if the condition did not improve or worsened

21  within seventy-two hours.  (DUF 4-7; ECF No. 44-5 at 13.)  The 0.5 oz. tube of anti-fungal cream

22  only provided enough medication to cover plaintiff's affected areas for two days.  (FAC ¶ 25.)

---

[3] See ECF No. 44-2 (Defendant's Statement of Undisputed Material Facts ("DUF")).  Plaintiff did not file a statement of Disputed/Undisputed Facts as required by Local Rule 260(b).  But see ECF No. 53 at 17-30, 55-70 (addressing DUF).

[4] Unless otherwise indicated, the events described took place in 2009.

[5] In his role as a Registered Nurse, Goodgame's scope of licensure did not include diagnosis or treatment of diseases, except according to protocols developed by his supervising nurses, and in consultation with physicians.  (DUF 66.)

1    Between September 13 and 20, plaintiff did not submit any written requests for medical

2    care; however, he reported to the MCSP medical clinic "to try to get more anti-itch cream." A

3    nurse supplied him with a small tube of athlete's foot cream on September 13. (DUF 8; FAC ¶

4    26.)

5    On September 22, plaintiff submitted a medical request form indicating that the itching

6    had moved to different parts of his body and he had been scratching himself. He continued: "The

7    Athlete's Foot cream only partially works – can you arrange some kind of injection to take care of

8    it – ASAP please." (DUF 9; ECF No. 44-5 at 14.)

9    On September 25, plaintiff was examined by non-defendant Physician Assistant (PA)

10   Akintola, who diagnosed him with possible neurotic excoriation. (DUF 10.) Akintola prescribed

11   Triamcinolone 0.1 cream[6] and oral Benadryl. (DUF 11.) Four days later, not having received the

12   medication from the pharmacy, plaintiff submitted a medical request form stating in part: "I am in

13   bad shape scratching till I bleed and bruise. PLEASE FIND THE FAULT. I NEED HELP! P.S.

14   I've asked for help for 3 weeks to NO avail!" (ECF No. 44-5 at 17.) On October 2, plaintiff

15   submitted another request for his medication (ECF No. 44-5 at 19), and that day received

16   Benadryl and Triamcinolone.[7] (DUF 12-13; FAC ¶ 36.)

17   Within a week, on October 8, 2009, plaintiff requested a refill of Triamcinolone cream.

18   (DUF 14.) On October 13, 2009, plaintiff renewed his request in a medical request form

19   addressed to the "Chief Medical Officer." In it, plaintiff described "severe itching over 90% of

20   my body which has persisted for over 6 weeks. Pharmacy/'C' clinic notified by order will not be

21   filled till 10/21. By what logic am I to suffer another 2 wks. w/o relief? I am already drawing

22

---

23   [6] Triamcinolone cream is a steroid indicated for the relief of inflammatory and itchy
     manifestations of cortiosteroid-responsive skin conditions such as eczema, dermatitis, rash, insect
24   bites, poison ivy, allergies, and other irritations. (DUF 45.)

25   [7] The parties dispute the amount of medication plaintiff received, or at least how long that amount
     would last. Plaintiff alleges that, during the month of October 2009, he "was issued only three 1
26   ounce tubes of Triamcinolone 0.1 cream . . . on 10/2, 10/16, and 10/27/09. Properly applied with
     3 applications daily, a tube would last 2-days." (FAC ¶ 40.) Defendants assert that plaintiff's
27   prescriptions for Triamcinolone "were to last either thirty or sixty days." (DUF 47; see DUF 13,
     19.)
28

1    blood and bruised from scratching.  Provide relief now while needed."  (ECF No. 44-5 at 22.)

2    Chief Medical Officer Heatley did not respond to this request.  (FAC ¶ 38.)

3            Two days later, on October 15, 2009, plaintiff was examined by non-defendant PA Todd,

4    who noted a possible diagnosis of dermatitis and ordered a refill of Triamcinolone and a

5    prescription for systemic methyl prednisone.  (DUF 16-19.)  These medications "did nothing for

6    the underlying condition 'scabies.'"  (FAC ¶ 39.)

7            On October 19, 2009, plaintiff requested a refill of Triamcinolone cream, stating: "My

8    itching continues over my whole body and has now extended to my hands, [n]eck, and into my

9    hair line.  I DO NOT HAVE ENOUGH CREAM REMAINING TO TAKE ME INTO THE

10   WEEKEND."  (ECF No. 44-5 at 25.)  A refill was provided four days later, on October 26.  (DUF

11   20-21.)

12           On October 29, plaintiff submitted a medical request for more Triamcinolone cream,

13   stating:

14               As I have explained: Intense itching/rash is on my entire body
                (body surface approx. 12 sq ft). 30g cream (approx 1 oz) is barely
15              enough for 4-5 days even used sparingly & diluted.  Last tube
                issued 10/26 . . . will be totally consumed Sat. 10/31.  Please
16              provide as itching severe causing bleeding and bruising.  T.Y.

17   (ECF No. 44-5 at 28.)

18           The following day, Goodgame examined plaintiff and noted on the response portion of the

19   form that plaintiff continued to be diagnosed with

20              dermatitis sporadically throughout body.  Red bumps on bilateral
                arms, legs, and front and back upper torso and buttocks.  Risk for
21              impaired skin integrity R/T red itchy bumps.  Continue on
                Triamcinolone as prescribed also Benadryl for itching.  I/M was
22              advised that MD appointment is pending.

23   (ECF No. 44-5 at 28.)

24           On November 3, plaintiff again spoke to Goodgame "at an RN Medical Line

25   appointment."  Plaintiff requested a refill of anti-itch cream, asked for an appointment with a

26   dermatologist, and asked that full-body photos be taken of the "wounds, bleeding and bruises all

27   over his body."  (FAC ¶ 41.)  Goodgame refused these requests and told plaintiff they did not

28   have a camera, even though plaintiff knew a camera was kept in the Program Office and "could

                                                   6

1    be made available." (Id.)  When plaintiff asked Goodgame why he was not being provided

2    sufficient anti-itching medication, Goodgame went into another examination room and, when he

3    returned, told plaintiff it was a "Committee decision."[8] (Id.)  Plaintiff asked Goodgame why he

4    was not being provided relief from itching.  Goodgame replied: "Could be your attitude." (Id.)

5          On November 11, plaintiff submitted a medical request form asking for a dermatologist

6    appointment.  He stated that he was "[s]uffering severe itching/rash resulting in open wounds &

7    sleep deprivation since" the first week in September; that Dr. Tseng had refused to address this

8    condition at plaintiff's September 8 appointment; and that appointments with Nurse Goodgame

9    had "proven futile."  The form is marked received on November 12; otherwise, no response is

10   noted. (ECF No. 44-5 at 29.)

11         On November 16, plaintiff submitted a health care services request form addressed to

12   Nurse Goodgame, stating: "Again I am asking that a full body photo be taken to document full

13   body rash and open, bleeding sores/wounds.  Do not tell me again no camera is available; there is

14   a camera in the Program Office used to memorialize such events.  Please have photos taken now."

15   Plaintiff "cc'd" the Chief Medical Officer at MSCP on the form.  It is marked received on

16   November 17; otherwise, no response is noted. (ECF No. 44-5 at 30.)  Chief Medical Officer

17   Heatley never reviewed or received the form, and was unaware of it until plaintiff filed this

18   action. (DUF 28.)

19         On November 18, plaintiff submitted a medical request form complaining of "swollen

20   ankles" and noting his "full body rash."  The form is marked received on November 19;

21   otherwise, no response is noted. (ECF No. 44-5 at 31.)  The same day, he submitted a separate

22   health services request for a refill of his Triamcinolone cream, noting: "Tube lasts only 3 days[.]

23   Full body rash & itching."  The form is marked received on November 19; otherwise, no response

24   is noted. (ECF No. 44-5 at 32.)

25   /////

26

27   ─────────────
     [8] Plaintiff alleges that the Medical Authorization Review ("MAR") Committee is "staffed by
     defendants Smith, Heatley, and Heffner and makes ruling on individual healthcare courses of
28   treatment." (Id.)

1   　　　On November 20, Dr. Tseng evaluated plaintiff, noting in part that plaintiff was "very

2   upset, . . . says he's been suffering an itchy rash since first week of September.  Rash has

3   progressed from initial groin area to entire body – torso/arms/legs/back.  Cellie has not contracted

4   this problem.  [Patient] says he has some relief with TAC cream, but he runs out of cream [in] 3-4

5   days and he can't get a refill until next month." (ECF No. 44-5 at 33.)  Tseng hypothesized that

6   the itching was due to a change in soap that occurred around the same time as the rash started.

7   Tseng ordered Vitamin A & D ointment, Triamcinolone cream, and a topical anti-fungal cream

8   called Clotrimazole.  Tseng ordered plaintiff to change back to the soap he was using before the

9   itching began and to follow up regarding the rash in 30 days.  (Id.; DUF 30-33.)

10  　　　Eight days later, on November 28, plaintiff requested a refill of all three medications

11  prescribed by Tseng on November 20.  (ECF No. 44-5 at 35.)[9]

12  　　　On March 1, 2010[10], plaintiff's cellmate James Dailey came down with the "identical rash

13  plaintiff had now suffered over 6 months."  Dailey submitted a medical request form stating that

14  he had a few spots of intense itching, and his cellmate – plaintiff – had been having these

15  symptoms for six months or more.  (FAC ¶ 48.)

16  　　　Also on March 1, plaintiff submitted a medical request stating that his body itching

17  continued, though "less severe," and asking why his February 22 request for a Triamcinolone

18  refill had been ignored.  (ECF No. 44-5 at 38.)

19  　　　On March 6, plaintiff submitted a medical request stating that the itching he had suffered

20  since September 2009 continued.  Plaintiff stated:  "I need anti-itch cream.  I still believe this is

21  [9] Defendants assert that plaintiff did not submit any healthcare services request forms about his
22  skin condition between November 28, 2009 and March 1, 2010.  (DUF 36-37.)  In opposition,
    plaintiff offers as evidence several health services request forms that he claims to have submitted
23  during this period.  (ECF 53 at 102-105, 109-111.)  Defendants object that these records are
    inadmissible because have not been authenticated and plaintiff has altered them with his
24  handwritten notes, "destroying their authenticity [and] any possible evidentiary value." (ECF No.
    59 at 3.)  Plaintiff acknowledges that he made notes on these exhibits (ECF No. 63 at 6), which
25  appear to document his requests for refills of Triamcinolone and other medications from the
    prison pharmacy.  As they are cumulative of other evidence and not especially relevant to the
26  named defendants, the court does not consider them for purposes of summary judgment.

27  [10] The following events occurred in 2010.

28

1  scabies.  Theory 'stress' unfounded.  Am now in Ad-Seg . . . This is your best chance to treat for

2  scabies (in isolation).  Error [sic] on side of caution and treat or send me to a dermatologist as I

3  requested long ago."  The response portion of the form notes that it was received on March 8 and

4  "referred to the RN line" for empiric treatment of scabies.  (ECF No. 44-5 at 40.)

5       On March 9, plaintiff submitted a health care services request stating that his body itching

6  that started in September 2009 continued.  "It started dissipating from a severeness of 10++  . . .

7  to a 3 in January and February 2010.  It is now escalating.  My cellie is also itching and

8  scratching.  Unless stress is contagious . . . You need to guess again; BEFORE it again worsens!"

9  This request was also referred to the RN line for treatment of scabies.  (ECF No. 44-5 at 42.)

10       On March 10, Dr. Tseng examined plaintiff, whose skin exam revealed excoriation and

11  scars on both of his legs and his torso.  Dr. Tseng diagnosed plaintiff with eczema or neurogenic

12  dermatitis.  (DUF 40.)  Plaintiff and Dr. Tseng also discussed "the possibility that Plaintiff was

13  correct, and had suffered scabies for 6 months."  (FAC ¶ 51.)  Dr. Tseng instructed plaintiff to

14  continue using Triamcinolone cream.  He also referred plaintiff to the nurse for empiric treatment

15  of scabies and prescribed Eliminite cream, which is used to treat scabies.  (DUF 40; ECF No. 44-

16  5 at 43.)

17       The first treatment for scabies relieved almost all of plaintiff's symptoms.  On March 25,

18  Dr. Tseng ordered a repeat treatment, noting the initial treatment was very effective.  (DUF 42.)

19  After repeat treatments on March 30 and April 1, 2010, "the infection was 100% gone."  (FAC ¶

20  52.)  Plaintiff concludes that "a simple, easy treatment could have saved [him] 7 months of

21  needless suffering[.]"  (Id.)

22  2.  The "Scabies Outbreak"

23       In the complaint, plaintiff alleges that he "had been telling CDCR Medical Staff

24  Defendants . . . from the beginning of September 2009 that this is 'not' stress as they diagnosed. .

25  . . [T]his has always been scabies as Plaintiff has said from the beginning.  In the previous months

26  to Plaintiff's outbreak, there have been at least 5-cells in Building 11 [where Plaintiff was

27  housed] that had been treated for scabies."  (FAC ¶ 48.)  Plaintiff alleges that he "informed

28  Defendants Goodgame, et al. that he thought he contracted scabies from the showers" when he

1    put on shorts that had fallen into the shower water.  A few days later, he broke out in a rash. (Id.)

2         In opposition to summary judgment, plaintiff further argues that defendants should have

3    known he had scabies because the disease was common at MCSP in 2009 and 2010.  In support,

4    he attaches several inmates' signed statements that they contracted and were treated for scabies at

5    MCSP.  (ECF No. 53 at 128-140.)  One inmate housed in Building 11 was diagnosed in

6    November 2009 (id. at 128-131), others in 2009, 2010, or at unspecified times.  Certain inmates

7    refer to a "scabies outbreak" in Building 11, causing prison staff to give prisoners bleach to wipe

8    down their cells. (Id. at 128, 138-139.)  Defendants object to these statements as inadmissible

9    hearsay that are not "in the form of declarations."  (ECF No. 59 at 3.)  However, to the extent the

10   statements are based on personal knowledge and set forth facts that would be admissible at trial,

11   the court considers them on summary judgment.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th

12   Cir. 2003) (holding that the district court properly considered a diary which defendants moved to

13   strike as inadmissible hearsay because "[a]t the summary judgment stage, we do not focus on the

14   admissibility of the evidence's form.  We focus instead on the admissibility of its contents.").

15   3.  Defendants' Medical Expert

16        Defendants have submitted a declaration by a medical expert, Dr. Barnett, who states as

17   follows[11]:

18        In the medical community, the treatment for skin rash and itching is empiric, that is,

19   treatment is initiated by the primary care provider prior to the determination of a firm diagnosis.

20   (DUF 44.)  Overuse of the steroid Triamcinolone can lead to systemic absorption, which can

21   cause a range of adverse side effects including Cushing's syndrome, hyperglycemia, and

22   glucosuria.  (DUF 46.)  Although plaintiff's prescriptions for Triamcinolone were to last either

23   thirty or sixty days, plaintiff requested refills approximately every six to seven days during the

24   month of October 2009.  (ECF Nos. 47-48.)  The pharmacy did not refill plaintiff's prescription

25   on October 30, 2009 because he was at an increased risk of adverse side effects from overuse of

26   the medication.  (ECF No. 50; see ECF No. 44-5 at 28.)

27

28   _____
[11] (ECF No. 44-5.)

10

1    Medical practitioners often do not diagnose scabies in its early presentation, despite its

2    contagiousness.  Most patients with scabies do not display the burrows in the skin that medical

3    students are taught to expect with the presentation of scabies.  The patient with scabies often

4    complains of generalized itching with excoriated skin.  Without the presentation of burrows,

5    scabies can resemble an allergic reaction, dermatitis, or rash, and many patients with scabies are

6    treated as such.  (DUF 51.)  At times, a diagnosis of scabies is made after the patient's rash and

7    itching has continued for some months.  (DUF 52.)  The symptoms described by plaintiff in his

8    complaint and in the medical records could have been caused by many conditions, and were not

9    clearly attributable to scabies.  (DUF 53.)

10    In a declaration submitted with defendant's motion, defendant Dr. Smith states that he did

11    not evaluate or treat plaintiff for any skin condition, and was not aware that plaintiff had any skin

12    condition, during the time relevant to the complaint.  (DUF 60.)

13    Similarly, defendant Dr. Heffner did not evaluate or treat plaintiff for any skin condition,

14    and was not aware that plaintiff had any skin condition, during the time relevant to the complaint.

15    (DUF 63.)

16    Dr. Heatley did not receive or review any requests for health care services submitted by

17    plaintiff regarding skin rash, itching, or scabies.  He was not aware of such requests until plaintiff

18    filed this lawsuit.  (DUF 62.)  Dr. Heatley did not evaluate or treat plaintiff for any skin condition

19    during the time relevant to the complaint.  The only health care services Dr. Heatley provided to

20    plaintiff during that time were to order an EKG, chest x-ray, and lab tests related to plaintiff's

21    transurethral resection of his prostate, a condition entirely unrelated to skin rash.  (DUF 61.)

22    B.  Defendants' Motion

23    Defendants argue that the undisputed facts show that Dr. Tseng and Nurse Goodgame

24    provided plaintiff medically appropriate treatment.

25    Denial or delay of medical care for a prisoner's serious medical needs may constitute a

26    violation of the prisoner's Eighth and Fourteenth Amendment rights.  Estelle v. Gamble, 429 U.S.

27    97, 104-05 (1976).  An individual is liable for such a violation only when the individual is

28    deliberately indifferent to a prisoner's serious medical needs.  Id.; see Jett v. Penner, 439 F.3d

11

1     1091, 1096 (9th Cir. 2006); <u>Hallett v. Morgan</u>, 296 F.3d 732, 744 (9th Cir. 2002); <u>Lopez v.</u>

2     <u>Smith</u>, 203 F.3d 1122, 1131-32 (9th Cir. 2000).

3           In the Ninth Circuit, the test for deliberate indifference consists of two parts. <u>Jett</u>, 439

4     F.3d at 1096. First, the plaintiff must show a "serious medical need" by demonstrating that

5     "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary

6     and wanton infliction of pain.'" <u>Id.</u>, citing <u>Estelle</u>, 429 U.S. at 104. For purposes of the motion,

7     defendants do not dispute that plaintiff's skin rash and itching constituted a serious medical need.

8     (ECF No. 44-1 at 11, n.1.)

9           Second, the plaintiff must show the defendant's response to the need was deliberately

10    indifferent. <u>Jett</u>, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act

11    or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

12    indifference. <u>Id.</u> Under this standard, the prison official must not only "be aware of facts from

13    which the inference could be drawn that a substantial risk of serious harm exists," but that person

14    "must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). This "subjective

15    approach" focuses only "on what a defendant's mental attitude actually was." <u>Id.</u> at 839. "While

16    poor medical treatment will at a certain point rise to the level of constitutional violation, mere

17    malpractice, or even gross negligence, does not suffice." <u>Wood v. Housewright</u>, 900 F.2d 1332,

18    1334 (9th Cir. 1990). On the other hand, deliberate indifference does not require that a physician

19    altogether fail to treat an inmate. <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir. 1989).

20    Even if some treatment is prescribed, a failure to competently treat a serious medical condition

21    may constitute deliberate indifference in a particular case. <u>Id.</u>

22          Here, the question is whether Tenore and/or Goodgame were deliberately indifferent in

23    their response to plaintiff's serious medical need.

24          Defendants argue that there is no "competent evidence" that plaintiff suffered from

25    scabies since the beginning of September 2009, and that plaintiff simply "assumes that, because

26    empirical treatment for scabies appears to have remedied his skin condition," Goodgame and

27    Tseng were deliberately indifferent. Defendants characterize this as a "mere difference of

28    opinion concerning appropriate treatment" between an inmate and medical staff. (ECF No.  44-1

1  at 14.)  A difference of opinion about the proper course of treatment is not deliberate indifference,

2  nor does a dispute between a prisoner and prison officials over the necessity for or extent of

3  medical treatment amount to a constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d

4  1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

5        The court finds this argument unpersuasive.  On summary judgment, all reasonable

6  inferences that may be drawn from the facts placed before the court must be drawn in favor of the

7  opposing party.  See Matsushita, 475 U.S. at 587.  From the facts set forth above, it is reasonable

8  to infer that plaintiff's use of Eliminite cream in March 2010 promptly relieved his symptoms –

9  which he had been experiencing to a greater or lesser degree since September 2009 – because,

10  unlike previously-prescribed treatments, it addressed the underlying cause of scabies.  Put another

11  way, they suggest that plaintiff's medical providers did not accurately diagnose his scabies until

12  March 2010.  The court declines to adopt the view that the failure to accurately diagnose a

13  patient's condition is a "mere difference of opinion concerning appropriate treatment."  See Ortiz,

14  884 F.2d at 1314 ("As this court has stated, 'access to medical staff is meaningless unless that

15  staff is competent and can render competent care.'"), citing Cabrales v. County of Los Angeles,

16  864 F.2d 1454, 1461 (9th Cir. 1988).

17        Moreover, the delay in providing effective medical treatment to plaintiff caused him

18  significant harm.  See Hallet, 296 F.3d at 745-46 (where a prisoner alleges that delay of medical

19  treatment constitutes deliberate indifference, the prisoner must show that the delay caused

20  "significant harm and that Defendants should have known this to be the case.")  Between early

21  September and late November 2009, plaintiff submitted numerous medical requests that

22  documented in vivid terms the extent of his suffering and discomfort.  His symptoms because less

23  severe in early 2010, but began "escalating" in March 2010.  Certainly the sheer length of time

24  that plaintiff was subject to these symptoms without relief is itself a significant harm.

25        Defendants point out that Dr. Tseng and Nurse Goodgame did not disregard plaintiff's

26  symptoms, but evaluated and treated them at appointments on November 20, March 10, and

27  March 25 (Tseng); and September 10 and October 30 (Goodgame).  As to Tseng, defendants omit

28  the September 8 appointment in which, according to plaintiff, Dr. Tseng declined to address

13

1    plaintiff's complaint of severe itching, telling him they were "out of time" and advising him to

2    put in a sick-call form.  Otherwise, the evidence shows that, on November 20, Dr. Tseng

3    evaluated plaintiff, prescribed medications to address his rash, and told him to change his soap

4    and follow up in 30 days.  On March 10 and 25, Dr. Tseng prescribed anti-scabies medication that

5    proved effective.

6          Defendants also omit plaintiff's claimed November 3 meeting with Nurse Goodgame, in

7    which – again, according to plaintiff – plaintiff asked why he was not being provided relief and

8    Goodgame responded: "Could be your attitude."  Otherwise, the evidence shows that September

9    10 and October 30, Nurse Goodgame examined plaintiff, noted his complaints, and prescribed

10   medications to treat his itching and rash.

11         Defendants also present undisputed expert opinion to the effect that, because scabies

12   symptoms often resemble symptoms caused by other conditions, doctors and nurses "often" fail

13   to diagnose scabies early on, "at times" only making an accurate diagnosis "after the patient's

14   rash and itching has continued for some months."  (DUF 51-52.)  From this unfortunate fact,

15   which the court accepts as true for purposes of the motion, Dr. Barnett concludes that even if

16   Tseng and Goodgame failed to diagnose plaintiff's condition for several months, the care they

17   provided did not fall below the level generally accepted in the medical community.  (Barnett

18   Decl. ¶¶ 47-48.)

19         Certain other facts in the record complicate this picture, however.  Drawing all reasonable

20   inferences in plaintiff's favor, the facts before the court suggest that other inmates in Building 11

21   contracted and were treated for scabies during the relevant timeframe, and that – in plaintiff's

22   persistent attempts to get relief in 2009 – he raised the possibility with Tseng and/or Goodgame

23   that his symptoms were attributable to scabies.  Yet plaintiff was not prescribed Eliminite cream

24   until he specifically asked (again) for scabies treatment in March 2010.  These facts go to

25   defendants' state of mind in the "deliberate indifference" analysis.   In Farmer, the Supreme Court

26   held that a prison official is deliberately indifferent only if "the official knows of and disregards

27   an excessive risk to inmate health and safety; the officials must both be aware of facts from which

28   the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

1    the inference." 511 U.S. at 837.  To prove knowledge of the risk, the prisoner may rely on

2    circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish

3    knowledge.  Id. at 842.  Prison officials may not escape liability because they cannot, or did not,

4    identify the specific source of the risk; the serious threat can be one to which all prisoners are

5    exposed.  Id. at 843.  Prison officials may, however, avoid liability by presenting evidence that

6    they lacked knowledge of the risk.  Id. at 844.  Moreover, prison officials may avoid liability by

7    presenting evidence of a reasonable, albeit unsuccessful, response to the risk.  Id. at 844–45.

8           Here, the court concludes that plaintiff has established a genuine dispute of material fact

9    as to whether defendants Tseng and Goodgame were deliberately indifferent – not because they

10   entirely failed to treat him, but because they (possibly) knew and disregarded plaintiff's risk of

11   having scabies when other treatments proved ineffective.  In reaching this conclusion, the court

12   notes the following key facts, drawing all reasonable inferences in plaintiff's favor:

13          By the time Nurse Goodgame examined plaintiff on October 30, 2009, plaintiff had been

14   applying Triamcinolone cream for twenty-eight days, including multiple refills of his September

15   25 prescription.  He had also been prescribed anti-fungal cream, oral Benadryl, and systemic

16   methyl prednisone.  Despite these medications, plaintiff continued to complain of "intense" and

17   "severe itching over 90% of my body," causing him to scratch until he was bruised and

18   bleeding.[12]  Goodgame's examination revealed "red itchy bumps" all over plaintiff's body.  Other

19   inmates in Building 11 had contracted scabies in 2009, and plaintiff may have verbally raised the

20   possibility that his symptoms were attributable to scabies.  Yet Nurse Goodgame directed plaintiff

21   to "[c]ontinue on Triamcinolone" and Benadryl – two medications that, for the past month, had

22   not halted the spread of the rash or relieved plaintiff's symptoms.  When plaintiff again spoke to

23   Nurse Goodgame on November 3, the latter remarked that plaintiff was not being provided relief

24   because of his "attitude."

25          By the time Dr. Tseng examined plaintiff on November 20, plaintiff had been applying

26   Triamcinolone cream for a month and a half, during which time his itchy rash had spread from his

27   _____

28   [12] The court draws the reasonable inference that this documented information was in plaintiff's
     medical record, reviewable by Goodgame and Tseng at the time of their examinations.

1    groin area to his entire body.  Though plaintiff experienced "some relief" from the cream, he had

2    been suffering from the rash since early September and was "very upset."  He had "wounds,

3    bleeding, and bruises" all over his body from scratching.  Other inmates in Building 11 had

4    contracted scabies in 2009, and plaintiff may have verbally raised the possibility that his

5    symptoms were attributable to scabies.  Yet Dr. Tseng hypothesized that plaintiff's full-body rash

6    was due to a change in his soap.  He told plaintiff to try a different soap and ordered more

7    Triamcinolone, along with more anti-fungal cream and a Vitamin A & D ointment.  Dr. Tseng did

8    not diagnose plaintiff with scabies until March 2010, when plaintiff submitted a medical request

9    form stating that he "still believe[d] this [was] scabies" and asking prison officials to "err[ ] on

10   the side of caution" and treat him for this condition, or send him to a dermatologist "as I

11   requested long ago."  On March 10, plaintiff and Dr. Tseng discussed "the possibility that

12   Plaintiff was correct, and had suffered scabies for 6 months."  Only then did Dr. Tseng prescribe

13   Eliminite cream for treatment of scabies, which promptly cured plaintiff's condition.

14          Based on the foregoing, the undersigned will recommend that defendants' motion for

15   summary judgment be denied as to defendants Tseng and Goodgame.  As to remaining

16   defendants Smith, Heffner, and Heatley, the court finds that they are entitled to summary

17   judgment, as the record does not show a sufficient causal connection between their actions or

18   inactions and plaintiff's injury so to make them potentially liable under § 1983.  See Monell v.

19   Dep't of Soc. Services, 436 U.S. 658, 691–92 (1978).

20   C.  Qualified Immunity

21          Defendants argue that, even assuming that Dr. Tseng and Nurse Goodgame violated

22   plaintiff's Eighth Amendment right to humane conditions of confinement by failing to timely

23   address his scabies, they are entitled to qualified immunity, as they reasonably believed they were

24   providing him with constitutionally adequate medical care.

25          Government officials enjoy qualified immunity from civil damages unless their conduct

26   violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

27   (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is

28   presented with a qualified immunity defense, the central questions for the court are: (1) whether

16

1   the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

2   defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

3   was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001).

4          Here, construing the facts in the light most favorable to plaintiff, Saucier, 533 U.S. at 201,

5   the court must assume that Tseng and Goodgame were deliberately indifferent to plaintiff's

6   serious medical need, violating his clearly established Eighth Amendment right to adequate health

7   care while incarcerated. So construed, plaintiff's allegations preclude summary judgment on

8   defendants' qualified immunity defense. See Nelson v. Runnels, 2010 WL 3238925, *16 (E.D.

9   Cal. Aug. 12, 2010) (defendants not entitled to qualified immunity where "there remain material

10  factual disputes regarding . . . the extent to which defendants knew of and disregarded an

11  excessive risk of harm to plaintiff's health") (collecting cases).

12         Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary

13  judgment (ECF No. 44) be DENIED as to defendants Tseng and Goodgame and GRANTED as to

14  defendants Smith, Heffner and Heatley.

15         These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties. Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

20  shall be served and filed within fourteen days after service of the objections. The parties are

21  advised that failure to file objections within the specified time may waive the right to appeal the

22  District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  Dated:  February 6, 2014

24                                              _____
                                                CAROLYN K. DELANEY
25                                              UNITED STATES MAGISTRATE JUDGE

26

27

28  2 / teno1082.sj